[Cite as *J&H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.*, 2012-Ohio-5298.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

J & H REINFORCING & STRUCTURAL ERECTORS, INC.

     Plaintiff/Counter Defendant

     v.

OHIO SCHOOL FACILITIES COMMISSION

     Defendant/Counter Plaintiff

Case No. 2010-07644

Judge Joseph T. Clark
Referee Thomas R. Yocum

DECISION OF THE REFEREE

{¶ 1} Plaintiff/Counter Defendant, J & H Reinforcing & Structural Erectors, Inc. (J&H), brought this action against Defendant/Counter Plaintiff, Ohio School Facilities Commission (OSFC), alleging breach of contract.[1] OSFC has asserted a counterclaim for breach of contract and breach of express and implied warranties. The issues of liability and damages were not bifurcated and the case proceeded to trial on both issues.

{¶ 2} In 2007, OSFC and the Wheelersburg Local Schools Board of Education (Wheelersburg) solicited bids for the construction of a school that was to house grades K-12. OSFC had previously contracted with Tanner Stone Holsinger Donges & Company (Tanner Stone) to act as project architect and Bovis Lend Lease Company (Bovis) to act as its construction manager.

{¶ 3} J&H secured two separate contracts for the project. The first involved the pre-construction site work (Joint Exhibit O), and the second (the "Contract" which is

---

[1] The court finds that both Count II of plaintiff's complaint seeking an "equitable adjustment to the contract" and Count III seeking damages for "breach of express and implied warranty," state essentially the same claim asserted in Count I. Accordingly, those counts will not be separately addressed in this

subject of this litigation) involved the combination of general trades work, masonry, and interior case work (Joint Exhibit F - Joint Exhibits are referred to herein as "JX"). Notice to J&H to proceed was issued by Bovis on October 2, 2006. (Plaintiff's Exhibit 91 - Plaintiff's Exhibits are referred to herein as "PX.") However, shortly after work was to begin, J&H encountered soil conditions which were unexpected and which proved to be too unstable to support the structure. J&H subsequently performed lime stabilization work pursuant to a contract change order. (JX P.) According to J&H, the delay caused by the poor soil conditions pushed the start of building construction out to December 26, 2006.

{¶ 4} The general trades work progressed at a steady pace from January 2007 through July 2007. However, J&H learned that several Air Handling Units (AHUs) supplied by another contractor which were originally scheduled to be delivered in May 2007, were not going to arrive until September 2007. In order to accommodate the untimely delivery of the AHUs, J&H was required to leave a number of large gaps in the masonry walls as a means of ingress and egress for the oversized vehicles, cranes and structural steel that would be needed to deliver, set in place, and install the AHUs. In other areas, J&H's roofing subcontractor was unable to perform its work due to the untimely delivery of the AHUs. The parties agree that the sequence of the masonry and roofing work was affected by the late delivery of the AHUs, but OSFC argues that this delay did not impact J&H's efficiency or costs.

{¶ 5} On or about January 2008, it became clear to J&H, Bovis and OSFC that the March 17, 2008 project completion date would be impossible to meet and that project completion before the start of the next school year in September was also in jeopardy. Following negotiations, the parties executed Change Order 29 (CO 29) (JX G-29) whereby J&H agreed to extend the project completion date from March 17, 2008, to July 15, 2008, in return for additional compensation. There is considerable disagreement whether CO 29 represents an accord and satisfaction of all pending issues between the parties or just a partial settlement thereof. There is no dispute that work on the project continued in earnest following the execution of CO 29.

---

decision. For the same reason, Count II of the counterclaim will not be separately addressed.

{¶ 6} In connection with the execution of CO 29, Bovis had drafted a new project schedule incorporating the agreed July 15, 2008 completion date. In an email correspondence sent to project contractors dated February 28, 2008, William Palonis, Bovis' project manager, stated, "[we] feel at this time the schedule is displaying an accurate approach of how the project team is going to meet the completion date of July 15, 2008." (See PX 129.)

{¶ 7} However, even before Palonis sent his email, the accuracy of the new schedule was called into question by J&H Project Manager, Mark Rollins. In fact, beginning on or about February 14, 2008, Rollins began sending letters to Palonis informing Bovis that the schedule did not accurately reflect the progress that was being made in the field and asking Bovis either for additional time to complete specific tasks or for a corresponding extension of the project completion date. Rollins estimated that he sent 12-14 such letters over the next four months. (See PX 286.) In his last such letter dated June 30, 2008, Rollins requested an extension of the completion date to December 16, 2008.

{¶ 8} Bovis ignored many of the letters, and in those instances where a response was made, J&H was informed that its requests were not in compliance with Article 6 of the contract. However, as a direct result of the letters, Bovis issued a "72-hour notice" to several other contractors on April 11, 2008. (See PX 140, 140A & 140B.) In the notices, Bovis states:

{¶ 9} Bovis Lend Lease has received notification of delay from J&H Erectors that specifically addresses your scope of work as cause of delay. Let this notification serve as 72 hour notice that any scope of work directly related to your contract that is impacting the completion of J&H Erectors work will be your responsibility.

{¶ 10} A contemporaneous series of emails between Bovis Vice President, Jim Swartzmiller, and Palonis evidence Bovis' desire to use the 72-hour notices as a means to paint J&H as the bad guy in the minds of the other contractors. Swartzmiller stated that he was getting tired of letters from J&H. The Bovis strategy (as the representative of OSFC) was to pit other contractors against J&H by sending 72-hour notices to other prime contractors, attach a copy of J&H correspondence, "paint J&H as instigator," and "watch fireworks." OSFC's Construction Manager viewed this as a "win

win." (PX 137.) The concept of "winning" by sowing conflict and dissension among the project contractors represents the antithesis of what the Construction Manager should have been doing. It represents a lack of good faith and makes a mockery of the concept "partnering." The tenor of these communications do not indicate that the Construction Manager was working as part of a team to timely complete the project for the good of all concerned. This sort of adversarial, disrespectful, and even demeaning attitude on the part of not only the Construction Manager, but also, OSFC's own project manager is reflected in other conduct and communications including reference to Mark Rollins as "Don Jr." (PX 153), and OSFC's project manager dressing in a Halloween costume as a caricature of J&H's owner, Don Hadsell (the photograph of which was widely distributed). (PX 299-003.)

{¶ 11} What Rollins, J&H, and the other contractors on the project did not know at this time was that Bovis had deliberately manipulated its own scheduling software by switching to a "project override mode" so that a schedule could be produced with a July 15, 2008 completion date, even though Bovis knew that such a schedule was both unrealistic and unmanageable. The above-referenced letters Rollins sent to Palonis document the effects of that decision upon J&H.

{¶ 12} In June 2009, with the start of the school year looming and progress on the project slowing, Bovis brought in Bruce Wilson as its new project superintendent. By all accounts, Wilson was a take charge manager with both the authority and ability to quickly and competently respond to contractor concerns without further consultation or prior approval. For example, Wilson commonly authorized payment for additional work by issuing informal "tickets" which meant that the work could proceed in advance of a formal CO.

{¶ 13} Under Wilson's leadership and what Wilson described as a "heroic effort" by J&H, the project was substantially completed in time for the school year. Thereafter, on August 4, 2008, Wheelersburg School District received a Certificate of Temporary Occupancy (PX 170), just prior to the start of the school year. Although there was still some minor construction and "punch list" items that were not complete, the parties agree that substantial completion was achieved on August 4, 2008. On October 6, 2008, J&H submitted a "claim letter" dated September 29, 2008 prepared by David

Carothers, C.P.A. on behalf of J&H.  (PX 176.)  This correspondence is stamped as received by Bovis on October 14, 2008.  On August 19, 2009, J&H submitted a certified claim and request for equitable adjustment to the contract pursuant to Article 8, with supporting exhibits prepared by Tim Calvey.  (PX 1.)  Therein, Calvey provided a detailed analysis of J&H's labor inefficiency claims, and the Harris Floor pass through claim based on a "measured mile" approach.

{¶ 14} Although J&H requested a meeting with OSFC, pursuant to Article 8, no action was ever taken by OSFC on the J&H claim.  Bovis and OSFC failed to process in good faith the Article 8 claim of J&H.  In an email dated August 21, 2009 from Jim Swartzmiller to Mark Knapp and Jennifer Fetty, Swartzmiller's proposed response to the Article 8 claim of J&H was to "do a simple rejection and send them packing * * *"  (PX 214.)  Swartzmiller advocated dispensing with a formal Article 8 hearing, and taking J&H "to the mat on this one" as Swartzmiller claimed that "Our documents, schedules, and time extension changes are in great order."  (PX 214.)  However, Swartzmiller later conceded that there were concerns expressed by OSFC's scheduling consultant regarding the "negative lags" in the schedule.  (PX 201.)

**CHANGE ORDER 29**

{¶ 15} On January 16, 2008, a partnering session was held at which time J&H and the other contractors on the project agreed that a proposed new completion date of July 15, 2008, was achievable provided OSFC was willing to issue a change order to compensate the contractors for the costs associated with the change in the schedule including overtime compensation.  Bovis then instructed the contractors to submit price proposals for review.  On January 24, 2008, J&H submitted its proposal.

{¶ 16} Following negotiations between J&H and Bovis, the parties executed CO 29 on February 19, 2008, in the total amount not to exceed $113,479.04.  (JX G-29.) The document provides, in relevant part, under the heading "Description/Justification":

{¶ 17} Additional costs associated with revising the Contract Completion Date to July 15, 2008, which includes General Conditions costs of $73,251.87 and an Overtime Allowance of $40,227.17.

{¶ 18} The Overtime Allowance is a Not To Exceed amount for overtime work which shall be pre-approved by Bovis Lend Lease and tracked via Work Orders signed daily.

**{¶ 19}** This Change Order extends the Completion Date for the Project from March 17, 2008, to July 15, 2008. Wheelersburg Local School District Board of Education and The Ohio School Facilities Commission shall not assert, and hereby waive, any claim for liquidated damages as a result of the completion of the K-12 School Project by July 15, 2008.

**{¶ 20}** According to J&H, the plain language of CO 29 evidences the parties' intent that compensation thereunder is limited to the two specific items identified in the body of the document: 1) extended general conditions from to March 7, 2008 to July 15, 2008; and 2) an overtime allowance for anticipated future need. J&H argues that CO 29 was intended only as a partial satisfaction of its claims.

**{¶ 21}** Defendant contends that the sums paid to J&H pursuant to CO 29 were intended by the parties as a full and complete satisfaction of all claims J&H may have had for additional compensation, including claims arising from the untimely delivery of the AHUs. OSFC relies upon the following language of CO 29 in support of its contention:

**{¶ 22}** The compensation or time extension provided by this Change Order constitutes full and complete satisfaction for all direct and indirect costs, and interest related thereto, which has been or may be incurred *in connection with this change to the work*, including but not limited to, any delays, inefficiencies, disruption or suspension, extended overhead, acceleration, and the cumulative impact of this and other change orders issues [sic] as of this date. (Emphasis added.)

**{¶ 23}** The parties' course of performance establishes that the language relied upon by OSFC is boilerplate which appears in every change order issued on this project, regardless of whether the boilerplate terms have any relevance to the change to the work set out in the "description/justification." Moreover, the court finds that the phrase "in connection with this change to the work" operates as an expressed limitation upon the boilerplate language. In other words, the term "full and complete satisfaction," used in the boilerplate is limited to the change to the work specified in the "description/justification."

**{¶ 24}** Contract interpretation is a matter of law for the court. *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶38. When interpreting a contract, a court's principle objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d

270, 273, 1999-Ohio-162. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. In determining the parties' intent, a court must read the contract as a whole and give effect, if possible, to every part of the contract. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361-362, 1997-Ohio-202.

{¶ 25} Based upon a review of the four corners of CO 29, and giving effect to every part thereof, the court finds that the "change to the work" referenced in CO 29 is an extension of the contract completion date by 120 days to July 15, 2008. The parties intended that compensation thereunder was in consideration of: extended general conditions from to March 7, 2008, to July 15, 2008; and an overtime allowance for anticipated future need. CO 29 does not bar J&H from seeking recovery of costs associated with other compensable delays, inefficiencies, or acceleration, provided J&H can prove that such claims were timely asserted and that OSFC is contractually obligated to pay such claims. J&H must also prove both the existence and amount of its damages.

{¶ 26} J&H argues, in the alternative, that CO 29 contains an ambiguity in that the language in the body of the document conflicts with the boilerplate language. Accordingly, J&H has offered extrinsic evidence of the parties' negotiations as well as previous drafts of CO 29 in support of its interpretation.[2] However, under the parol evidence rule, "'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Galmish v. Cicchini*, 90 Ohio St.3d 22, 2000-Ohio-7, quoting 11 Williston on Contracts (4 ed.1999) 569-70, Section 33:4.

{¶ 27} Having concluded that the intent of the parties is clear from the four corners of CO 29, and that the relevant portions of CO 29 do not conflict, extrinsic evidence of the parties' intent is not admissible. Therefore, the court has not considered

---

[2] J&H was permitted to proffer extrinsic evidence of the parties intent conditioned upon a subsequent determination by the court that CO 29 contained an ambiguity. Specifically, J&H proffered a prior version of CO 29 (Plaintiff's Exhibit 122), several email correspondences and the testimony of several witnesses regarding the negotiations that led up to the execution of CO 29. Based upon the court's ruling, the evidence was not admitted.

such evidence either in determining the parties' intent or in making the initial determination whether an ambiguity exists. See *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28.

**J&H CLAIMS**

{¶ 28} Upon review of the Carothers and Calvey reports, and in consideration of the witness testimony, other exhibits, and arguments of counsel, the court finds that J&H asserts the following specific claims for additional compensation which are summarized in the J&H Post-Trial Brief:

| J&H's Delay and Inefficiency Damages | | |
|---|---|---|
| Home Office Overhead | $354,258.95 | |
| Extended General Conditions From July 15, 2008 Thru Sept. 29 2008 | $46,392.68 | |
| Idle Equipment | $271,850.17 | |
| Increased Wage Rate | $27,934.24 | |
| Premium OT | $112,447.24 | |
| Labor Inefficiency | $1,228,861.00 | |
| Credit for Labor Rate Adjustment By Tim Calvey | ($122,470.00) | |
| **Subtotal for Delay and Inefficiency Damages** | | $1,919,274.28 |
| | | |
| **Harris Flooring Pass Thru Claim** | | |
| Loss of Productivity | | $107,384.38 |
| | | |
| **J&H's Direct Cost Damages For Scope of Work Changes** | | |
| Custom Built Display Cases | $79,118.95 | |
| Labor #8 Stone over #304/seal soil | $72,339.05 | |
| Signage Cost Claim | $19,599.00 | |
| Exterior Canopy Finish Thru 6-11-06 | $14,135.76 | |
| Playground Equipment Cost Claim | $96,921.86 | |

| | | |
|---|---|---|
| **Subtotal for Direct Cost Damages** | | $282,114.62 |
| | | |
| **Contract Balance** | | $72,291.40 |
| | | |
| **Deduct for Acknowledged Flashing Deficiencies** | | ($32,893.00) |
| | | |
| **Prejudgment Interest** | | $372,730.66 |
| | | |
| **TOTAL** | | **$2,720,902.34** |

{¶ 29} As shown by the chart above, J&H seeks recovery based upon several separate and distinct claims. J&H's delay and inefficiency claim arises from several distinct occurrences which occurred during the course of the project.

{¶ 30} First, J&H seeks compensation for additional costs associated with the late start of the project. According to J&H, the late start pushed many construction activities into the winter months of 2007. J&H was required to perform foundation and footer work in the winter months when such work is both inefficient and costly. Second, J&H alleges that the untimely delivery of the AHUs resulted in extra costs associated with the delay in the completion of the masonry work, out-of-sequence work, and additional cold weather protection. Third, J&H alleges that it was impacted and incurred additional costs in the later stages of the project due to delay by others, out of sequence work, and in order to comply with the unmanageable schedule and unreasonable completion date imposed upon it by OSFC. The extra costs associated with this claim include acceleration, overtime pay, out-of-sequence work costs, and inefficiencies associated with the stacking of trades.

{¶ 31} J&H has also asserted a "pass through claim" on behalf of its subcontractor, Harris Floor Covering, Inc. seeking recovery of alleged extra costs arising from the same circumstances that gave rise to J&H's acceleration claim.

**PRESERVATION OF CLAIMS-DEFENSE OF WAIVER**

**{¶ 32}** OSFC contends that J&H failed to either timely assert or otherwise preserve its claims for delays, inefficiencies, and acceleration pursuant to the relevant provisions of the Contract. With respect to delays, the Contract provides at Article 6 of the General Conditions as follows:

**{¶ 33}** 6.4.1 Any request by the Contractor for an extension of time shall be made in writing to the Construction Manager no more than ten (10) days after the initial occurrence of any condition which, in the Contractor's opinion, entitles the Contractor to an extension of time. Failure to timely provide such notice to the Construction Manager shall constitute a waiver by the Contractor of any claim for extension, damages or mitigation of Liquidated Damages, to the fullest extent permitted by law.

**{¶ 34}** The Tenth District Court of Appeals has explained that where work is delayed due to various circumstances, such as suspension of work which is not the fault of the contractor or an unforeseeable cause, it is the contractor's responsibility to request an extension of time within 10 days of "its formation of a belief that a particular condition would entitle it to such an extension." *Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 162 Ohio App.3d 491, 2005-Ohio-3810, ¶42, affirmed 113 Ohio St.3d 226, 2007-Ohio-1687. Affirming the Tenth District Court of Appeals, the Supreme Court of Ohio determined that the contractor may not disregard its obligations under Article 6, even if the state has actual notice of the need for changes. *Dugan & Meyers*, supra, 2007-Ohio-1687, ¶41. "[S]omething more than actual notice on the part of the state is required to excuse a contractor from complying with its obligations regarding change-order procedures in public works contracts." *Stanley Miller Constr. Co. v. Ohio School Facilities Comm.,* Franklin App. Nos. 10AP-298, 10AP-299, 10AP-432 & 10AP-433, 2010-Ohio-6397, ¶17, citing *Dugan & Meyers,* supra, 2007-Ohio-1687.

**{¶ 35}** J&H claims to have suffered damages associated with the 60-day delay in the start of the construction which resulted from the need to perform pre-construction soil stabilization. However, the only correspondence J&H can point to regarding notice to OSFC is a November 5, 2007 letter from Rollins to Palonis wherein Rollins requested an extension to the contract of 84 days.

**{¶ 36}** The weight of the evidence convinces the court that J&H did not comply with Contract notice requirements regarding early site conditions. The failure of notice

under Article 6 is fatal to Plaintiff's claim for an equitable adjustment relating to early site conditions pursuant to Article 8 which provides at Section 8.1.1 as follows:

{¶ 37} Any request for equitable adjustment of Contract shall be made in writing to the Architect, through the Construction Manager, and filed prior to Contract Completion, provided the Contractor notified the Architect, through the Construction Manager, no more than ten (10) days after the initial occurrence of the facts which are the basis of the claim. To the fullest extent permitted by law, failure of the Contractor to timely provide such notice and a contemporaneous statement of damages shall constitute a waiver by the Contractor of any claim for additional compensation or for mitigation of Liquidated Damages.

{¶ 38} In short, the Contract shall not be equitably adjusted to account for extra costs incurred by J&H due to the unanticipated soil conditions.

{¶ 39} Concerning the claim for extra costs associated with the untimely delivery of the AHUs, the evidence establishes that J&H sent correspondence to Bovis on August 28, 2007 and November 5, 2007, which, in the opinion of the court, satisfy the requirements of Article 6. The letter from Rollins to Palonis on August 28, 2007, contains details regarding the specific areas of the masonry and roofing work that are being delayed and requests Bovis "publish a Request for Proposal to extend our contract an additional 44 days." Rollins further states: "Obviously the number of days we are being impacted increases daily not only from the perspective of actual calendar days but also the longer-range effect (sic) on subsequent activities."

{¶ 40} The November 5, 2007 letter from Rollins references the prior notice and asks for a "Request for Proposal," this time for 73 days. The letter ends as follows: "We also reserve the opportunity to revisit the impact the delayed arrival and installation of the AHUs will have on our contract as construction activities are executed during the upcoming weeks as mentioned above."

{¶ 41} OSFC claims that J&H's notice was untimely in that it should have been sent in June or July when the AHUs were supposed to be delivered. This argument seems specious in light of the fact that the delays of which J&H complains did not occur on the first day the AHUs were late. Rather, the extra costs accrued over time as J&H gained knowledge that the scheduled work activities on a particular date would be delayed and that out of sequence work would subsequently need to be performed. In fact, the evidence shows that the impact of the AHU delays first occurred in early

August 2007, but that J&H did not form a belief that such delays would entitle it to a specific time extension until later that month, shortly before Rollins authored his August 28, 2007 letter.

{¶ 42} Furthermore, to the extent that OSFC asserts that J&H's notice letters do not comply with the requirement of Article 6.4.2.2 in that J&H failed to identify the "responsible party," the court finds that J&H was not in a position to determine who was responsible for the delay inasmuch as the evidence shows that the delay was the result of multiple issues relating to the AHUs.[3]  Palonis testified that the equipment was being shipped from Canada and there were customs issues.  There was delay in the submittal process, due to among other things, changes by the engineer and many "revise and resubmit" comments from the engineer.  (PX 99.)  OSFC failed to establish how a contractor such as J&H would be in a position to determine whether it was the owner, the engineer, the construction manager, the mechanical contractor, the supplier, U.S. Customs, or some other party who was "responsible" for this delay.  In the court's opinion, OSFC simply seeks to impose an impossible burden on J&H for the purpose of avoiding an otherwise valid delay claim.  Furthermore, Bovis interpreted the J&H correspondence as identifying other trade contractors as potentially responsible parties and sent 72-hour notice letters to those contractors.  (See PX 140, 140A & 140B.)

{¶ 43} Based upon the foregoing, the court finds that J&H substantially complied with the relevant Contract requirements regarding notice of impact from delay in delivery and installation of the AHUs.  Furthermore, to the extent that the requirements of Article 6.4.2.2 would prevent recovery under the circumstances, such requirements violate and are void and unenforceable by operation of R.C. 4113.62.

## 2008 DELAY, INEFFICIENCY, AND ACCELERATION CLAIM

{¶ 44} As noted above, the post-CO 29 delays and stacking of trades was the subject of Rollins' letter-writing campaign which began in February 2008.  OSFC claims that the letters failed to comply with Article 6 in several respects, and were thus

---

[3]Article 6.4.2 provides in part:
"The Contractor's request shall provide the following information so that a timely response may be made to minimize any resulting damages, injury or expense. * * *
"6.4.2.2  Identification of persons, entities and events responsible for the interference, disruption, hindrance or delay;"

ineffective in preserving J&H claims for delays and inefficiencies. For example, in correspondence dated April 8, 2008 and November 11, 2008, Bovis requested that J&H comply with the requirements of Article 6 if J&H intended to assert a delay claim.

{¶ 45} Additionally, as the court has noted, the correspondence between and among Bovis employees, demonstrate a lack of good faith and fair dealing by Bovis and OSFC with respect to J&H. For example the statements "paint J&H as instigator" and "watch fireworks" were made in reference to the strategy of pitting other contractors against J&H. Swartzmiller's characterization of such a strategy as "win-win" for Bovis defies the concept of team work necessary to timely complete the project. Swartzmiller also stated that he was "getting tired of letters from J&H." (See PX 137.) Bovis and OSFC demonstrated a lack of respect for J&H by referring to Mark Rollins as "Don Jr." (PX 153) and taking and distributing a Halloween photograph mocking Don Hadsell.[4] Moreover, as a practical matter, it was impossible for J&H to strictly comply with any requirement to quantify the amount of its damages for labor inefficiency until it could conduct a 'measured mile' analysis.

{¶ 46} Based upon the evidence presented on this issue, the court finds that OSFC's insistence upon strict compliance with Contract notice requirements, was nothing more than a strategy employed by OSFC and Bovis to prevent J&H from filing a claim. As noted above, J&H's project manager wrote numerous letters in an effort to comply with the Contract notice requirements. Indeed, the letters were so numerous that OSFC's construction manager directed J&H to stop writing. In the opinion of the court, such conduct on the part of OSFC constitutes a waiver of strict compliance with the notice requirements. Indeed, the directive from Bovis to stop writing letters constituted a recognition that strict compliance with notice requirements was becoming a distraction from the task at hand of carrying out the necessary activity to construct a school.

---

[4]Article 4 of the contract provides in relevant part:

"4.4.1 In order to most effectively and efficiently accomplish the construction of the Project, the School District Board and the Commission encourage the formation of a cohesive, mutually beneficial partnering arrangement among all Contractors, * * * and the Construction Manager. * * *

"4.4.2 The purpose of the partnering arrangement is to build cooperative relationships between such persons and avoid or minimize disputes and to nurture a more collaborative ethic characterized by trust, cooperation and teamwork. * * *"

{¶ 47} R.C. 4113.62 codifies public policy regarding waiver of contractor claims as follows:

{¶ 48} (C)(1) Any provision of a construction contract, agreement, or understanding, or specification or other documentation that is made a part of a construction contract, agreement, or understanding, that waives or precludes liability for delay during the course of a construction contract when the cause of the delay is a proximate result of the owner's act or failure to act, or that waives any other remedy for a construction contract when the cause of the delay is a proximate result of the owner's act or failure to act, is void and unenforceable as against public policy.

{¶ 49} Paragraph 4.1.2 of the Contract General Conditions provides:

{¶ 50} The sole remedy provided * * * for any injury, damages or expenses resulting from interference, hindrance, disruption or delay caused by or between contractors or their agents and employees shall be an extension of time in which to complete the work.  This provision is intended to be, and shall be construed as, consistent with, and not in conflict with Section 4113.62, ORC.  (See JX C.)

{¶ 51} General Condition paragraph 6.3.1 contains a similar provision which provides, "To the fullest extent permitted by law, any extension of time granted pursuant to paragraph GC 6.2 shall be the Contractor's sole remedy * * *"  Paragraph 6.3.1 is not applicable since OSFC did not issue the schedule extension requested by J&H relating to the 2008 delays.

{¶ 52} So as not to run afoul of R.C. 4113.62, neither provision can preclude liability of OSFC for owner caused delay. In fact, paragraph GC 4.1.2 refers to damages resulting from interference or delay "caused by or between contractors or their agents and employees."  In this instance, the court finds that the primary cause of delay was the conduct of the owner, OSFC, including improper and misleading scheduling that involved "project override" methodology.  According to OSFC's own scheduling expert, Kelly Roeschke, "project override" scheduling results in work being performed out of sequence in that it disconnects the logic ties between activities.  In describing the benefit of the project override in creating a schedule, Roeschke stated that "the constraints of logic are no longer applicable."  He also conceded that project override is not the preferred method of scheduling.  Indeed, the evidence presented by J&H was that this type of scheduling is prohibited on Ohio Department of Transportation projects.

{¶ 53} Inasmuch as OSFC's unrealistic and unworkable schedule caused the stacking of trades on this project and resulted in some or all of the delays and inefficiencies experienced by J&H, neither Article 4.1.2 nor the corresponding provisions of Article 6 limit J&H's remedies. See *Cleveland Constr., Inc. v. Ohio Public Emps. Retirement Sys.*, Franklin App. No. 07AP-574, 2008-Ohio-1630 (finding that pursuant to R.C. 4113.62(C)(1) "an owner cannot cause a delay, and then avoid the natural consequences for causing the delay by using boilerplate contract language.").

{¶ 54} OSFC next contends that J&H failed to comply with Article 8 in the submission of its claim for an equitable adjustment. The court disagrees.[5] There is no question that a certified Article 8 claim was timely submitted by J&H. Although substantial completion of the project was achieved on or about August 4, 2008, when the certificate of temporary occupancy was issued, work on the project continued. Moreover, pursuant to the Contract terms, Contract completion is deemed to be when final payment is made. Final payment has not been made. Thus, both the Carothers "claim letter" (PX 176) and the certified claim with Calvey report (PX 1) were timely forwarded to OSFC.

{¶ 55} Furthermore, to the extent that OSFC contends that J&H's supporting information and documentation do not meet all of the requirements of Article 8, the court disagrees. Article 8 provides a cooperative process by which such issues may be resolved. Indeed, it is ironic that OSFC asserts a contract defense based upon the alleged failure of J&H to strictly comply with the requirements of Article 8, when the evidence establishes that OSFC completely failed to comply with the Article 8 meeting requirements and claims process notwithstanding eleven such requests by J&H. (See

---

[5]Article 8.1.2 requires that "the Contractor shall provide the following information to permit evaluation of the request for equitable adjustment of the Contract.

"8.1.2.1 Nature and amount of the claim, which the Contractor shall certify before a notary public is a fair and accurate assessment of the damages suffered by the Contractor;

"8.1.2.2 Identification of persons, entities and events responsible for the claim;

"8.1.2.3 Activities on the Construction Schedule affected by the claim or new activities created by any delay, interference, hindrance or disruption and the relationship with existing activities;

"8.1.2.4 Anticipated duration of any delay, interference, hindrance or disruption;

"8.1.2.5 Recommended action to avoid or minimize any future delay, interference, hindrance or disruption.

"8.1.3 The Contractor shall promptly provide any additional information requested by the Construction Manager or the Architect.

"8.6.1 The rate of any prejudgment interest shall be at the average of the prime rates established at the commercial banks in the city of over 100,000 population that is nearest to the Project."

PX 287.)  In short, the court finds that J&H substantially complied with Article 8 both in the submission and substance of its claims for delays and inefficiencies arising from the untimely delivery of the AHUs and from the 2008 impacts, including the unrealistic and unworkable schedule.

## MERITS OF J&H's CLAIMS

{¶ 56} Turning to the merits of the various elements of J&H's claims and the value thereof, OSFC argues that because J&H "made money" on the project, J&H was not harmed.  This argument implies that regardless of whether OSFC breached the contract, J&H cannot recover because it suffered no damages (having made profit and overhead on the project.)  OSFC refines this argument by comparing what amount of profit and overhead J&H planned to make according to its bid records and what amount it actually made.  OSFC argues that J&H made more than it expected to contribute to profit and overhead.

{¶ 57} While this information may be relevant to assist in assessing the reliability and credibility of J&H's damages claim, in and of itself, the fact that J&H may have made more profit and overhead than it anticipated is not a defense.  Such a proposed defense carries with it the implicit corollary that if OSFC breached the contract, and the contractor made less overhead and profit than expected, then OSFC would be liable for the lesser amount of overhead and profit. The court doubts that OSFC advocates this approach.  The flaws with this approach include issues of whether the original bid was accurate and complete, and whether there is any causal connection between the breach of contract and the difference in profit amount which may be the result of other totally unrelated factors.

{¶ 58} In this instance, the comparison of anticipated profit to actual profit is of little value in assessing the claim.  Reasons for this include J&H's method of bidding, which, for example, in relation to the masonry items was a "conservative" approach (i.e. high number), and the omission from the bid amount of any value for a large quantity of self-owned equipment. Furthermore, the fact that J&H may have been more productive than expected during certain parts of the project does not mean that it was not impacted (resulting in damages) at other points in the project.

**LABOR INEFFICIENCY ANALYSIS**

FIRST IMPACT PERIOD

{¶ 59} J&H claims labor inefficiency damages for a first impact period of August 6, 2007 to January 31, 2008. The claim amount is based on a "measured mile" calculation by J&H's expert, Tim Calvey. (PX 004.)  OSFC's expert Kelly Roeschke testified that he has used the "measured mile" method of calculating labor inefficiency and corroborated the opinion of J&H's expert Calvey that "measured mile" is the preferred method of calculating labor inefficiency.  Roeschke further testified that if he used the measured mile method in this instance, he would have used August, September, and October (2007) as the months for the first impacted period.  He considered this an appropriate period to measure.  The court agrees with Roeschke that August, September, and October 2007 are the months which should be considered for the first impact period.

{¶ 60} Since Calvey calculated a longer time for the first impact period, his damages calculation cannot be accepted in toto.  To arrive at the labor inefficiency damages amount for 2007, it is necessary to extract the monthly data contained in the Calvey Report (PX 004, pg. CAL002390) and calculate the inefficiency impact only for the months of August, September, and October 2007.  The evidence established that the dates listed in the Calvey report refer to the monthly pay applications that covered labor for the month preceding the pay application, and ending on the listed date.  Accordingly, the pay applications dated 9-10-07, 10-1-07, and 11-6-07 cover the months of August, September, and October, respectively.  These pay applications also set forth the percentage of work completed during the preceding month.

{¶ 61} Calvey testified (as set forth in his report) that during the un-impacted period earlier in 2007, it took 842 labor hours to complete 1% of the project work.  This is considered the "measured mile."  According to Calvey, this is the number of labor hours that it should have taken to complete each 1% of similar work on the project if

J&H's work was not impacted.  The court finds that similar work was performed in both the pre-impact period and the first impact period.  Indeed, Roeschke acknowledged that masonry was the largest component of both un-impacted and impacted time periods.

{¶ 62} Calvey testified that the labor rate, including fringes, which should be utilized for 2007 is $43.18 per hour. This was an adjustment to his report which utilized the 2008 labor rate for both the 2007 and 2008 impact periods. In addition, the Contract General Conditions provide for an entitlement to 10% overhead and 5% profit on extra / change order labor.  (JX C at paragraph 7.4.7 and 7.4.9 respectively.)  These same mark-ups should be applied to the labor inefficiency claim.  Based upon the above, and the monthly labor hours listed in the Calvey report, the labor inefficiency damages for the first impact period are calculated as follows:

## LABOR INEFFICIENCY 2007

| DATE | ACTUAL LABOR HOURS | (MEASURED MILE) HOURS BASED ON 842 HOURS X % COMPLETE | EXCESS HOURS |
|---|---|---|---|
| 09-10-07 | 10,318 | (8.6%)   7,241.20 | 3,076.80 |
| 10-01-07 | 9,545 | (8.0%)   6,736 | 2,809 |
| 11-06-07 | 8,606 | (5.0%)   4,210 | 4,396 |
| | | Excess Hours | 10,281.80 |
| | | Labor rate for 2007 | x $43.18/hr. |
| | | Damages before Overhead and Profit | $443,968.12 |
| | | 10% Overhead | 44,396.81 |
| | | 5% Profit | 22,198.41 |
| | | Subtotal for 2007 | $510,563.34 |

SECOND IMPACT PERIOD

{¶ 63} J&H also claims labor inefficiency damages for a second impact period in 2008 from February 1 through August 4, 2008.  Roeschke acknowledged that J&H's work was impacted by the mechanical and electrical trades in March and April 2008.

Both experts agree that for the measured mile method to be valid, it requires comparing similar construction activities during both the impacted and un-impacted periods. Roeschke testified that Calvey included in the second impact period, punch list and other activities which are not similar to the measured mile activities. He further testified that these types of activities at the end of a project are inherently inefficient. The court agrees that the closer the construction activities were performed to the end of the project, the more dissimilar they became to the measured mile activities.

{¶ 64} Clearly, J&H and its subcontractor, Harris Floor, were impacted by delay and scheduling and sequencing problems in early 2008, caused by others, including Bovis and the mechanical and electrical contractors. Considering all of the evidence, the court concludes that the months of February, March, and April 2008 are the appropriate months to consider for the second impact period. Applying the same rationale as described above for 2007, the calculation for 2008 labor inefficiency damages is as follows:

**LABOR INEFFICIENCY 2008**

| DATE | ACTUAL LABOR HOURS | (MEASURED MILE) HOURS BASED ON 842 HOURS X % COMPLETE | EXCESS HOURS |
|---|---|---|---|
| 03-03-08 | 2,162 | (.5%)   421 | 1,741 |
| 04-07-08 | 2,451 | (1.1%)   926.20 | 1,524.80 |
| 05-05-08 | 2,199 | (1.9%)   1,599.80 | 599.20 |
| | | Excess Hours | 3,865 |
| | | Labor rate for 2008 | x $47.96/hr. |
| | | Damages before Overhead and Profit | $185,365.40 |
| | | 10% Overhead | 18,536.54 |
| | | 5% Profit | 9,268.27 |
| | | Subtotal for 2008 | $213,170.21 |

{¶ 65} Adding the labor inefficiency amount of damages for the first impact period in 2007 in the sum of $510,563.34 and the labor inefficiency amount for the second

impact period in 2008 in the sum of $213,170.21 results in total labor inefficiency damages in the sum of $723,733.55.

{¶ 66} Finally, the court notes that for the month of May, the hourly records indicate no impact. The pay application dated 6-2-08 (covering May work) shows 1,569 actual labor hours. Factoring in 1.9% work completed for that period would result in 1,599.80 hours based on the measured mile.

## HOME OFFICE OVERHEAD (HOO) AND EXTENDED GENERAL CONDITIONS

{¶ 67} J&H contends that it was never compensated for 186 days of HOO incurred during the extended period of time it was working on the project; 120 days incurred prior to CO 29 and 76 days incurred thereafter. J&H also argues that it is entitled to "extended general conditions" from July 15, 2008 through September 29, 2008. OSFC argues that J&H was compensated for HOO by way of CO 29, and that J&H is not entitled to any compensation for additional extended general conditions.

{¶ 68} Pursuant to CO 29, the parties agreed that the amount of $73,251.87 would be paid to J&H for the extended "General Conditions" related to extending the Contract by 120 days. The court finds that this compensation was intended to include and also pay for any additional HOO incurred through July 15, 2008. This equates to a daily rate for Extended General Conditions and Home Office Overhead agreed to by the parties of $610.43.

{¶ 69} With regard to the post-CO 29 period (beginning July 15, 2008), the court finds that the project was substantially completed on August 4, 2008, when the school district took occupancy, and that J&H no longer maintained a significant presence at the site thereafter. Based upon this finding, J&H is entitled to additional HOO and Extended General Conditions from July 15, 2008 through August 4, 2008, a period of 20 days. Based upon the agreed rate of compensation provided in CO 29 of $610.43 per day, and multiplying that figure by 20 days, the court finds that J&H is entitled to an award in the amount of $12,208.60 for this item.

## IDLE EQUIPMENT

{¶ 70} J&H claims to have incurred costs associated with equipment that remained idle during each of the two impact periods on this project. As noted above, the court has identified August, September, and October 2007 as the first such period and February, March, and April 2008 as the second impact period.

{¶ 71} OSFC argues that it did not receive timely notice of the idle equipment claim pursuant to Article 6 of the Contract. However, as noted above, J&H gave OSFC timely notice of the AHU delays and there is nothing in Article 6 that requires the contractor to specifically notify OSFC of either the existence or amount of idle equipment costs associated with the delay. Although such costs must be specified in the Article 8 claim, there is no such requirement in Article 6.

{¶ 72} J&H admittedly kept poor records regarding the equipment it maintained on the site at any given period of time. This is particularly true with respect to J&H-owned equipment. Additionally, in determining the value of the idle equipment, Calvey simply assumed that certain equipment was on the site during the entire impact period even though he could not point to any specific records documenting that claim.

{¶ 73} However, OSFC's expert, Kelly Roeschke, testified that he "could see" (figuratively), J&H's scaffolding and a power lift being on the site a couple extra months during the first impact period. Calvey credibly testified that such masonry equipment was reasonably estimated at a cost of $600.59 per day. The court finds that J&H established entitlement to additional compensation for equipment for 60 days at the rate of $600.59 per day for a total of $36,035.40 during the first impact period.

{¶ 74} Although logic would indicate that J&H must have also incurred such costs during the second impact period, there was not sufficient evidence upon which the court could determine either the existence or amount of such costs. Thus, any award would be purely speculative.

**INCREASED WAGE RATE**

{¶ 75} J&H claims $27,934.24 for labor costs resulting from an increased wage rate. J&H introduced PX 150 which established an increase in the Ironworkers wage rate effective June 1, 2008. This date is after the originally scheduled Contract completion date. CO 29 was not intended to cover any wage rate increases. OSFC

does not contest the amount of the claim, but rather J&H's entitlement thereto. Since J&H incurred the increased labor cost as a result of Owner caused delay, J&H is entitled to an award of this item in the sum of $27,934.24.

**OVERTIME**

{¶ 76} Calvey prepared a graph depicting the number of overtime hours worked by J&H during the entire project. Both the graph and the supporting documents show a spike in overtime during the summer of 2007, a period during which J&H was achieving its greatest productivity. The logical conclusion to draw from such evidence is that the overtime hours were incurred by J&H as a matter of choice rather than necessity. The evidence indicates that J&H incurred overtime as a result of its own business decision to take advantage of the weather and the site conditions while they were favorable. The evidence does not support a finding that either Bovis, OSFC or any other contractor was to blame for the bulk of the overtime expended during the summer of 2007. Indeed, it is more than a coincidence that during the time the overtime labor was being performed, J&H did not notify Bovis regarding this overtime or otherwise attempt to preserve an overtime claim.

{¶ 77} Although it seems reasonable that J&H may have incurred some overtime to regain the schedule after the air handling units were installed, without more specific evidence to identify, explain, and support this, the court will not engage in speculation.

{¶ 78} With respect to the overtime incurred later in the project, the court finds that J&H was adequately compensated for such time pursuant to the overtime allowance of $40,227.17 in CO 29.

**J&H DIRECT COST DAMAGE CLAIMS**

**1) Custom Built Display Cases**

{¶ 79} J&H seeks an equitable adjustment to the Contract in compensation for additional display case work costs which J&H claims it could not have reasonably anticipated at the time it bid the project. J&H contends that the project specifications required display case doors from a specified third-party manufacturer but that the plans

showed such doors in a size not produced by that manufacturer. Accordingly, J&H incurred extra costs associated with the unanticipated need for custom built doors.

{¶ 80} The parties' agreement provides a remedy for a contractor when such a situation arises. Article 1.5.2 of the General Conditions permits a contractor to inquire of the project architect if the contractor "perceives a * * * discrepancy on or between the Drawings and Specifications * * *."

{¶ 81} The testimony establishes that bidders are permitted to access this process, known commonly as a request for information (RFI), in advance of submitting bids. Thus, J&H was entitled, pursuant to Article 1.5.2, to seek an RFI if it was unsure of the availability of a product or its scope of work. J&H also had an opportunity to obtain information and a price quote from the specified manufacturer prior to submitting its bid. Presumably, J&H would have become aware of the unavailability of the doors from the manufacturer if it had sought a supplier quote.

{¶ 82} For these reasons, the court finds that J&H is not entitled to an equitable adjustment to the contract in order to compensate it for the additional costs associated with custom built display case doors.

### 2) Additional Labor - Stone Aggregate

{¶ 83} There is no dispute that soil conditions in the field necessitated additional stone to be used for the proper soil stabilization. The project architect authorized additional #8 stone to be placed on top of the #304 stone called for in the plans. On July 3, 2008, Rollins provided Bovis with a cost proposal for the additional materials and labor. (PX 045.)

{¶ 84} Although J&H was compensated for the cost of the additional material pursuant to change order CO 52, dated August 12, 2008 (JX G-52), Rollins testified credibly that proper compaction of the aggregate required a second rolling operation by J&H over the entire site. According to Rollins, the cost of this extra work is $72,339.05, including overhead and profit, for which J&H was not compensated. Based upon Rollins' testimony and the exhibits, the court finds that J&H is entitled to an equitable adjustment to the contract of $72,339.05 for this item.

### 3) Signage

{¶ 85} The General Trades package required J&H to furnish and install certain signs about the premises.  When J&H bid the project, apparently it did so utilizing pricing for what it considered to be "equivalent" to the specified material.  However, sometime after the Contract was awarded, J&H learned that its supplier was not on the OSFC approved list and could not work on the project.  J&H subsequently paid an approved subcontractor to perform the work at a greater cost to J&H.

{¶ 86} The evidence shows that the list of OSFC approved suppliers was available to bidders prior to the submission of bids.  In the exercise of due diligence, J&H could have discovered such information in advance of submitting its bid and could have adjusted its price accordingly.  J&H is not entitled to recover on this item.

### 4) Exterior Canopy Finish

{¶ 87} The General Trades package required J&H to install exterior canopies at certain points of entry.  J&H argues that its Contract did not require it to provide any specific type of finish for the entrance canopy ceiling.  J&H argues that the plans and specifications do not identify a finish for this surface.  (See PX 058.)

{¶ 88} The court finds that J&H knew or should have known that some type of finish was required inasmuch as detail S/3.14 specifically states that the abutting exterior surfaces are to be "painted."  (JX B/40.)  Consequently, J&H had reason to know that surfacing was required.  Thus, in the exercise of due diligence, J&H should have inquired of the project architect through an RFI at the bidding stage as to whether a finish would be required on the exterior canopy ceiling.  Accordingly, J&H is not entitled to recover on this claim item.

### 5) Playground Equipment

{¶ 89} J&H claims that its bid for installation and surfacing of the playground did not include the purchase of the equipment itself, and that OSFC required J&H to purchase the equipment at a cost of $82,839.20.  OSFC does not dispute the amount of cost for the playground equipment, but rather disputes J&H's entitlement to recovery on the basis that it should have been included in J&H's bid and is required by the Contract.

{¶ 90} The court's review of the relevant provisions in the Contract specifications, *i.e.* "General Trades-Special Requirements," reveals a pattern whereby the term "furnish and install" is used whenever the contractor is expected to purchase equipment or

fixtures in addition to providing installation.  With respect to the playground equipment at issue, the contract states, at page JX-A-0272: "Contractor is responsible for the installation of the playground equipment and surfacing."

{¶ 91} Based upon the plain language employed by the parties, the court finds that J&H did not agree to furnish the playground equipment as part of the Contract, and that it is entitled to an equitable adjustment to the Contract in order to compensate it for the additional expense.

{¶ 92} In an August 22, 2008 correspondence from Rollins to Clay Keith, Bovis' Senior Project Manager, Rollins notified Bovis of J&H's claim for the additional costs for the equipment plus a "mark up of 17%" for a total amount of $96,921.86.  J&H submitted a signed quote from its supplier in support of its claim.  (PX 062.)  The Contract General Conditions provide for an entitlement to 5% profit (not 17% mark up) on extra / change order material.  (JX C at paragraph 7.4.9.)  Profit amounts to $4,141.96.

{¶ 93} In consideration of the evidence, the court finds that J&H is entitled to additional compensation for the playground equipment in the amount of $86,981.16.

## CONTRACT BALANCE

{¶ 94} The parties do not disagree that a total of $72,291.40 in contract payments have been withheld by OSFC.  The evidence establishes that OSFC withheld payment pursuant to Article 9 of the Contract when it learned that substantial sums would be needed to pay for remedial work on the project.  Accordingly, the retention or release of such funds shall be determined in conjunction with the court's ruling on the Counterclaim.

## HARRIS FLOOR PASS THROUGH CLAIM

{¶ 95} With regard to the pass-through claim of Harris Floor, OSFC argues that the first notice it received of the claim was a letter dated August 19, 2009, setting forth Harris' damages, and that such notice is untimely, as a matter of law.  It is not necessary to determine whether Harris Floor gave timely notice of its claim, since the claim must fail for lack of proof.  Steve Harris testified that prior to March 2008, Harris

Floor was "Flying…Doing fine." After March, performance tumbled. There was stacking and congestion. However, things changed when Bovis brought Bruce Wilson onto the project. Wilson took charge at the end of May or the first of June. According to Harris (as well as all other witnesses who addressed the issue), Wilson did a good job. Sequencing and planning improved. Wilson provided helpful answers to questions. According to Harris: "Until Bruce got there, management was terrible."

{¶ 96} Harris testified that Harris Floor finished performance in August, just before school started. Based on the testimony of Harris, the bulk of impact on the performance of Harris Floor was in March, April and early May 2008. It is unclear to what extent, if at all, after Wilson took control of the project that Harris Floor was impacted. The evidence introduced does not contain a monthly breakdown of actual hours expended. Indeed, it appears that the data provided does not provide actual hours for the impacted period at all.

{¶ 97} The court cannot discern from the Calvey report and the Harris Floor records the amount of damages resulting from the impact on the labor efficiency of Harris Floor. Attached to the Harris Floor claim dated August 11, 2009 (PX 296 and Defendant's Exhibit E-6 - Defendant's Exhibits are referred to herein as "DX"), is a chart containing data regarding labor hours (see page CAL01308). One heading on this chart is "Actual Manhours Spent/ Forecast." Under this heading is a column sub-heading titled "Actual Manhours Through 4/7/08." Next to that is a column sub-heading titled "Forecasted to Complete Actual Manhours." Next to that is another column sub-heading titled "Projected Final Actual Manhours." These descriptions indicate that Calvey utilized a forecast or projection (*i.e.* an estimate) of hours that would be or were expended in the impact period rather that the actual number of labor hours that were expended. The court considers "projected actual" hours to be an oxymoron. As best the court can tell from the exhibits introduced, evidence was not presented of actual hours expended during the impact period. Hence, there is no actual hour quantity to which the measured mile can be compared to arrive at an impact amount. Further, the comparison performed by Calvey was for the entire alleged impact period through an unspecified completion date.

**{¶ 98}** Harris testified that he completed work on the project in August 2008. The court is not convinced that Harris Floor was impacted through its completion date. As described above, Harris testified that performance was proceeding much more smoothly after Wilson arrived at the end of May or the first of June. Further, an analysis of Pay Application No. 22 (JX L-22) for the period ending August 4, 2008, indicates that July was a very productive month for the Harris Floor scope of work. Line item 37 of the schedule of values relates to Acoustical Ceiling, CT/QT, VCT, Base, Carpet, and Resilient Flooring. Most or all of these items were in the Harris Floor scope of work. This Pay Application reflects that labor was performed in this scope of work valued at $118,785.40 from July 8, 2008 to August 4, 2008 (compare to Pay Application No. 21 for period ending July 7, 2008, JX L-21). The labor for line item 37 was 69.92% complete as of July 7 and 99% complete by August 4, 2008 establishing that approximately 30% of the entire labor value for this line item was completed during this period. Absent a specific showing of an inordinately large number of actual labor hours required during this period to accomplish this result, the court cannot conclude that Harris Floor was impacted at that time.

## SUMMARY OF AWARD ON THE COMPLAINT

**{¶ 99}** Based upon the foregoing, the court concludes that J&H has proven its claim for breach of contract by the preponderance of the evidence and that it is entitled to a judgment against OSFC upon the Complaint as follows: $723,733.55 for labor inefficiency; $12,208.60 for home office overhead and extended general conditions; $36,035.40 for idle equipment; $27,934.24 for increased wage rate; $72,339.05 for additional labor to install stone-aggregate; and $86,981.16 for playground equipment; all for total of $959,232.00. This amount is subject to off-set and reduction based on the Counterclaim as discussed below.

## COUNTERCLAIM

**{¶ 100}** OSFC's Counterclaim consists of several distinct items which OSFC summarized in DX R-13 and modified in its Post-Trial Brief. The Counterclaim is summarized by OSFC in the following chart:

| | CONTRACTOR/PROVIDER | INVOICE # | AMOUNT | COMMENTS |
|---|---|---|---|---|
| 1 | Mullins Construction | 018150 | $4,127.28 | Air Filtration |
| | Mullins Construction | 0192700 | $5,874.64 | Athletic field and West Lawn |
| | Mullins Construction | 016180 | $9,600.00 | Parking Lot |
| | Mullins Construction | 013101A | $2,820.29 | Fascia Repair |
| | | | **$22,422.21** | TOTAL (in 1) |
| | | | | |
| 2 | Edifice Restoration | Contract | $229,850.00 | Thru-wall and step flashing |
| | Edifice Restoration | CO #1 | ------ | |
| | Edifice Restoration | CO #2 | $1,851.86 | |
| | | | **$231,701.86** | TOTAL (in 2) |
| | | | | |
| 3 | StructureTec | | **$23,750.00** | Investigation of roof and high wall water leaks |
| 4 | Mullins Construction | | **$495.00** | Soffit repair – water damage |
| 5 | Portsmouth Daily Times | | **$249.20** | Bid Advertisement |
| 6 | Key Blue Print | | **$1,178.69** | Design and Bid document printing |
| 7 | TSHD | | **$9,000.00** | Design |
| 8 | CM Fees | | **$37,000.00** | Supervision |
| | | | | |
| | | | **$325,796.96** | **TOTAL DAMAGES** |

### 1) Through Wall Flashing - Edifice Restoration Costs

{¶ 101} Before the building was occupied in August 2008, school district employees noticed water leaking into the building whenever it rained.  The leaks damaged ceiling tiles in several areas of the building, ran down walls, and accumulated on the floor.  School district personnel were required to place buckets and trash barrels

in many of these areas to catch the dripping water.

{¶ 102} When the leaks persisted even after repairs were attempted both by J&H and its roofing subcontractor, OSFC contacted a company by the name of Structure Tech, to investigate the water intrusion issues.  Eric Seaverson, manager of Structure Tech's restoration group, visited the site to conduct a visual inspection of the leaks. Seaverson observed that many of the leaks aligned with the parapet walls and he suspected that the water intrusion may be caused, at least in part, by differential movement of the weight bearing masonry walls and the parapet walls.  Parapet walls are fashioned from sections of large masonry block that are erected at the top of the weight bearing masonry and rise above the roof edge in several areas of the building, including the gym and auditorium.

{¶ 103} Seaverson reviewed the project plans and determined that an asphalt-copper flashing system had been specified by the project architect.  He testified that the specifications require through wall flashing, step wall flashing, drip edge exposed flashing, and roof counter-flashing. According to the evidence, flashing acts as a water proof skin that adheres to the masonry walls behind the brick veneer and under the insulation.  According to Seaverson the design permits rainwater to pass through the porous brick veneer and onto the flashing which creates a channel for the water to run down the wall and onto drip edges and various collection areas (end dams) where it is directed out of the structure through strategically placed openings at ground level. According to Seaverson, water will penetrate any unprotected masonry walls and will eventually find its way into the structure.

{¶ 104} Seaverson returned to the site in September 2008, to conduct a more detailed inspection and some destructive testing.  Although his testing, including the use of a water hose to recreate the existing leaks, revealed the sources of some leaks, he recommended that destructive testing be performed at the exterior masonry walls.  A company by the name of Western Water Proofing was called upon to perform destructive testing which consisted of removing the exterior brick veneer in many different areas and inspecting the flashing system.  The destructive tests revealed poor workmanship and oversights in all eleven areas tested. The major problems included the complete absence of flashing in some areas and a discontinuity of flashing leaving

gaps where water could penetrate. Also, there were areas of un-adhered or under-adhered flashing, missing end dams, and loose or fallen mortar.

{¶ 105} Seaverson determined that the problems were so extensive that repairs would be ineffective and he therefore recommended that OSFC remove and replace the entire existing flashing system. Although he was of the opinion that the flashing system specified in the project plans was adequate, if properly installed, Seaverson suggested certain improvements, including the use of self-adhering, full metal pan flashing, and larger three-inch end dams. Based upon this recommendation, OSFC initiated a remediation project and solicited bids for the work.

{¶ 106} Edifice Restoration was awarded the contract for the remediation project including the cost of new ceiling tiles. John Hall, owner of Edifice, testified that he arrived at the site in May 2009 to begin the work. Hall testified about the condition of the flashing installed by J&H (or its subcontractor), and he identified a number of photographs taken by John Miller during the remediation project. Based upon Hall's testimony and the photographs admitted into evidence, the court finds that the same or similar errors and omissions uncovered by the Structure Tech and Western Water Proofing destructive testing were also observed in the flashing system installed by J&H throughout the entire structure. In short, the weight of the evidence convinces the court that J&H did not install the specified flashing system in a workmanlike manner. Thus, the only reasonable conclusion to be drawn from the evidence is that J&H breached the Contract with OSFC and that OSFC is entitled to damages.

{¶ 107} J&H argues that it cannot be held responsible for the cost of replacing the flashing system inasmuch as OSFC did not prove that the leaks observed throughout the building were due solely to its poor workmanship. Indeed, J&H expended considerable effort at trial attempting to establish that negligent design of the parapet walls was the cause of most of the leaks.

{¶ 108} Although J&H's poor workmanship would not have been so quickly discovered had the leaks not occurred, the fact remains that J&H failed to install the flashing system in a workmanlike manner regardless of the cause of the leaks. OSFC contracted with J&H to provide it with a through wall flashing system that met the design specifications. J&H did not meet its obligation.

{¶ 109} J&H also argues that the remediation work represents an improvement to the original design and that J&H should not be held responsible for the extra costs associated with the improvement. Regardless of whether the original flashing system was insufficient, the court agrees that J&H is not obligated to pay the extra costs associated with upgrades or enhancements.

{¶ 110} There is no dispute that the through wall flashing system installed by Edifice represents an improvement over the system as originally designed. For example, the end dams installed by Edifice were three inches in height rather than one inch as in the original design. The remedial design specified a self-adhesive flashing, which Seaverson believed would provide a better seal. OSFC elected not to go with the full metal pan flashing suggested by Seaverson.

{¶ 111} Hall testified that the difference in price between the end dams he used in the remediation project and the ones originally specified was approximately $1,500 over the entire project. However, there was no estimate regarding the price difference between the two brands of flashing. Seaverson stated only that the difference in price was minimal.

{¶ 112} J&H next contends that OSFC unfairly denied it the chance to repair the through wall flashing itself and that OSFC's subsequent decision to remove and replace all 18,000 feet of flashing and back-charge J&H for the cost was both unreasonable and excessive. The court disagrees.

{¶ 113} "The general rule is that an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank* (1999), 87 Ohio St.3d 270, 276. Here, the evidence establishes that J&H was initially given an opportunity to make repairs but that its efforts were largely unsuccessful; that J&H insisted the leaks were the result of poor parapet design; and that J&H accepted responsibility to remove and repair only 270 linear feet of the flashing without further compensation. Tom Brannon, OSFC Post Construction Administrator, testified that the "piecemeal repairs" suggested by J&H were not a viable solution to the ongoing problem. Moreover, as noted above, the destructive testing demonstrated that the through wall flashing was not installed in a workmanlike manner and that such a condition likely persisted throughout the structure. Under such

circumstances, and given the contentious relationship between the parties that existed at this point in time, it was reasonable for OSFC to look elsewhere for a solution to the water infiltration problems and to solicit bids from other contractors.

{¶ 114} In summary, OSFC established entitlement to damages relating to the remediation work performed by Edifice Restoration in the amount of $229,850 less $1,500 for enhancement for a net amount of $228,350.  This sum represents the portion of the cost of remediation that can be fairly attributed to the breach of contract by J&H. An additional sum of $1,851.86 pursuant to CO 2 is also compensable inasmuch as the evidence shows that the ceiling tiles would not have been damaged by the leaks in the parapet walls had a properly installed through wall flashing system been in place. The total amount to which OSFC is entitled for remedial work performed by Edifice Restoration is $230,201.86.

### 2)  Mullins Construction Remedial Work Costs

{¶ 115} Pursuant to the Contract, J&H was responsible for construction of a parking lot, sidewalks and an athletic field.  OSFC claims that J&H failed to deliver as promised in several respects.  First, OSFC alleges that a significant depression in the parking lot allowed water to accumulate to such a degree that a large portion of the lot was not useable for several days after it rained.  Second, OSFC alleges that J&H failed to properly fill and grade the athletic field so that it could be safely used by the students. Third, OSFC claims that a large grassy area near the main entrance way became a muddy ditch as a result of improper filling and grading.

{¶ 116} J&H contends that OSFC's decision to install curbing around the lot was the cause of the water retention problems.  However, the weight of the evidence convinces the court that the asphalt parking lot was not properly installed and that J&H is solely responsible for the cost of necessary repairs.  Mullins' invoice for the necessary repairs in the amount of $9,600 was paid by OSFC. (DX R 10.)

{¶ 117} With respect to the athletic field, the evidence establishes that J&H made an effort to fill and grade the athletic field but that the soil J&H deposited on the field was of such poor quality that school district staff and students were required to clear large rocks, bits of brick, and other construction debris before the field could be seeded. Based upon the weight of the evidence, J&H is responsible for the cost of the necessary

repair. OSFC paid Mullins Construction for this work pursuant to an invoice in the amount of $5,874.64. (DX R 9.)

{¶ 118} J&H argues that the movement of the school district's own field maintenance equipment over the affected area was the cause of the ruts in the athletic field and near the entryway. However, the weight of the evidence, in particular, the testimony of school district employee Darin Porter convinces the court that J&H is at fault for the condition. Accordingly, OSFC is entitled to compensation for this breach relating to the parking lot, athletic field, and entryway in the sum of $15,474.64 that OSFC paid Mullins for the necessary repairs.

{¶ 119} Mullins performed other remedial work. Some of this work related to installing an above-ceiling partition that was omitted by J&H. The type of work performed and the costs associated with each item of work performed by Mullins are documented in the group of Mullins' invoices admitted into evidence. (See DX 8 and 11.) The court is satisfied by the testimony of Clay Keith and others that the invoices in the amount of $4,127.28 and $2,820.29 submitted by Mullins represent reasonable costs incurred by OSFC to remedy work that was part of J&H's Contract, including the cost to remedy air infiltration and fascia repair. Accordingly, OSFC is entitled to recover damages in the amount $6,947.57 for J&H's breach for the work to remedy the air infiltration and for the fascia repair. OSFC has not adequately supported the claim in the amount of $495 for soffit repair allegedly performed by Mullins as a result of J&H-caused leaks.

{¶ 120} The total of all sums that OSFC is entitled to recover on its Counterclaim against J&H for remedial work performed by Mullins Construction is $22,422.21.

### 3) Structure Tech Fees

{¶ 121} As noted above, Structure Tech was called to the site to investigate leaks. Structure Tech attributed the leaks, at least in part, to the differential movement between the weight bearing walls and the parapet walls, which is a design issue. Yet OSFC asks the court to require J&H to foot the entire bill. Although Structure Tech issued a detailed report of its findings, an itemized invoice from Structure Tech was not admitted into evidence. Consequently, the court is not able to verify what fees Structure Tech charged and how they should be apportioned. As the burden to prove damages

asserted in the Counterclaim is squarely on OSFC, the court finds that OSFC has not met its burden on this item.

### 4) Architect Fees

{¶ 122} OSFC seeks architect fees of $9,000 allegedly incurred in the design of the remediation project. However, as noted above, Seaverson testified that the original design of the flashing system was adequate if properly installed. Moreover, the evidence establishes that several design improvements were incorporated into the remediation. In light of this evidence, and in the absence of an itemized bill or invoice for the architect services, the court finds that OSFC has failed to prove the extent to which such expenses can be fairly attributed to J&H. Accordingly, OSFC shall not recover this item of the Counterclaim.

### 5) Construction Management Fees

{¶ 123} OSFC seeks the sum of $37,000 for the services of a construction manager to supervise the remediation project.  Although the court acknowledges that some supervision was required, the evidence establishes that the remediation was completed in approximately 2 1/2 months and that work took place when school was out for the summer.  It appears that the construction manager was involved in some other activities at this time, including the ongoing investigation and analysis of the parapet wall problem (a design issue) and investigation of whether a sealant was applied to the brick (which claim was withdrawn when Counsel for J&H pointed out that it was not required under the Contract).  In the absence of a detailed breakdown of the construction manager's activity that would demonstrate what time was devoted solely to remediation activities for which J&H had responsibility, it is not possible to determine if the amount claimed is reasonable. Indeed, for the limited time frame and limited scope of work, the amount claimed appears excessive. Moreover, Bovis' email communications suggests an effort to document the project in such a way as to assure that J&H would be blamed for all remediation costs, including enhancements.  (See, *e.g.,* PX 257.)   Thus, OSFC has failed to produce sufficient evidence to establish its claim and, for the foregoing reasons, OSFC shall not recover construction management fees.

### 6) Bid Advertisement and Printing

**{¶ 124}** Finally, with regard to bid advertisement costs and design and bid document printing, the court has not been presented with sufficient testimonial or documentary evidencing establishing the existence or amount of these alleged costs to the required degree of proof. Additionally, as noted above, the court is unable to apportion these claimed costs to the breach by J&H without itemization by the vendor.

## SUMMARY OF COUNTERCLAIM DAMAGES

**{¶ 125}** In summary, OSFC has proven entitlement to an award of damages pursuant to its Counterclaim as follows: $230,201.86 for the remediation work performed by Edifice Restoration; and $22,422.21 for the remediation work performed by Mullins Construction. The total amount to which OSFC is entitled on its Counterclaim is $252,624.07, subject to adjustment for the Contract balance in the sum of $72,291.40 which was otherwise due.  The net Counterclaim award is $180,332.67, subject to offset by the sums awarded pursuant to the Complaint.

## CONCLUSION

**{¶ 126}** Inasmuch as the Complaint (award of $959,232.00) and Counterclaim (award of $180,332.67) arise from the same transaction or occurrence, the award to OSFC shall be offset against the award to J&H, and judgment is recommended in favor of J&H in the total amount of $778,899.33, plus prejudgment interest and costs of this action.

**{¶ 127}** Pre-judgment interest shall be payable from the due date, and the rate of interest shall be determined pursuant to Article 8.6.1 of the Contract which provides: "The rate of any prejudgment interest shall be at the average of the prime rates established at the commercial banks in the city of over 100,000 population nearest to the Project."

**{¶ 128}** In determining the due date, the court notes that the Contract General Conditions provide at paragraph 9.2.2 that payment is due on an approved Application for Payment within 30 days from the date of approval.  J&H submitted its certified Article 8 claim on or about August 19, 2009.  OSFC should be allotted a reasonable amount of

time to evaluate the claim; however, in this instance, the evidence indicates that there was no good faith effort to evaluate the claim. By August 21, 2009, Bovis and OSFC were already developing a strategy to reject the claim and forego the Article 8 process. (PX 214). The due date shall be deemed to be 30 days from the date of submittal of the certified claim, *i.e.,* September 18, 2009. Inasmuch as the contract rate has not been stipulated, such rate shall be determined at a subsequent proceeding and the court shall thereafter issue a final judgment in this case.

{¶ 129} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
THOMAS R. YOCUM
Referee

cc:

David A. Beals                             Donald W. Gregory
James E. Rook                            Michael J. Madigan
Jon C. Walden                            Capitol Square Office Building
Mark R. Wilson                           65 East State Street, Suite 1800
Assistant Attorneys General       Columbus, Ohio 43215-4294
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

006
Filed February 10, 2012
To S.C. Reporter November 15, 2012